# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Terry D.,

        Plaintiff,

   v.

Andrew Saul, Commissioner of Social
Security,[1]

        Defendant.

Case No. 18-cv-2056 (ECW)

**ORDER**

---

This matter is before the Court on Plaintiff Terry D.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 12) ("Motion") and Defendant Commissioner of Social Security Andrew Saul's ("Defendant") Motion for Summary Judgment (Dkt. 14) ("Cross-Motion"). Plaintiff filed this case seeking judicial review of a final decision by Defendant denying her application for disability insurance benefits. She specifically challenges the Administrative Law Judge's ("ALJ") evaluation of the treating opinions of Plaintiff's physician and the assessment of her residual functional capacity ("RFC"). For the reasons stated below, Plaintiff's Motion is denied, and Defendant's Cross-Motion is granted.

---

[1]     Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul, Commissioner of Social Security, is automatically substituted as a party in place of Nancy A. Berryhill, former Acting Commissioner of Social Security.

# I.    BACKGROUND

Plaintiff filed an application for Disability Insurance Benefits on June 29, 2015, alleging disability beginning January 1, 2009.  (R. 387.)[2]  Plaintiff's last date insured was December 31, 2013.  (R. 409.)  Plaintiff's application was denied initially (R. 249) and on reconsideration (R. 265).  Plaintiff requested a hearing before an ALJ, which was held on October 19, 2017 before ALJ Micah Pharris.  (R. 11.)  The ALJ then held a second hearing on December 15, 2017 to take the testimony of Plaintiff's treating physician, Sean E. Anderson, M.D., whom Plaintiff had seen regularly for many years.  (R. 91, 97-99.)  The ALJ issued an unfavorable decision on January 23, 2018.  (R. 29.)  Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff did not engage in substantial gainful activity between January 1, 2009 (the alleged onset date) and December 31, 2013 (her last day insured).  (R. 13.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: chronic pelvic pain with no objective findings; mild right foot degenerative joint disease by x-ray; right knee bursitis; left wrist degenerative joint disease; remote history of degenerative disc disease with some chronic back pain.  (R. 13.)  The ALJ determined that Plaintiff's other physical impairments were not severe, including: bronchitis/sinusitis; headaches; several non-durationally severe sprains and strains; Grave's disease; plantar fasciitis; hypothyroid; fatty liver; hypertension; and several diagnoses of pain without etiology.  (R. 14.)  The ALJ noted that each of these

---

[2]      The Social Security Administrative Record ("R.") is available at Dkt. 11.

impairments were not severe as it only lasted a short duration or had not been shown to more than minimally interfere with Plaintiff's ability to engage in basic work activities. (R. 14-17.)

At the third step, the ALJ determined that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17.) At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following RFC:

> to perform medium work[3] as defined in 20 CFR 404.1567(c) except the individual may frequently operate foot controls with the right foot. The individual may frequently handle and finger with the left upper extremity. The individual may frequently climb, stoop, kneel, crouch and crawl.

(R. 17.) Based on this RFC, the ALJ determined that Plaintiff was unable to perform any past relevant work as a hand packager, which the vocational expert ("VE") testified exceed Plaintiff's RFC. (R. 28.)

At step five, the ALJ asked the VE what other jobs a hypothetical person with Plaintiff's RFC, age, education, and work experience could perform in the national economy. (R. 29.) Given all the factors, the VE testified that such an individual could perform jobs such as warehouse worker, laundry worker, and hospital cleaner, which exist in significant numbers in the national economy. (R. 29.) Accordingly, the ALJ found Plaintiff not disabled. (R. 29.)

---

[3]     "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

Plaintiff requested review of the decision. (R. 1.) The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (R. 1.) Plaintiff then commenced this action for judicial review. The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.   RECORD

After an automobile accident in 1988 (R. 67), Plaintiff had MRIs in 1989 of her cervical and lumbar spine. (R. 474.) For the cervical spine, the MRI showed "[m]inimal degenerative central bulging of the disc annulae at C5-6, C6-7 and C7-T1 without cord impingement nor nerve root impingement." (*Id.*) For the lumbar spine, the MRI concluded: "1. Degenerative dehydration of the T12-L1 disc in association with a Schmorl's node.[4] This is a common association. 2. Very slight dehydration of the lumbar discs throughout the lumbar spine and mild tropism and degenerative facet disease at L4 -5 and L5-S1. No annular tear nor disc herniation is noted on this examination and there is no evidence of bony central or lateral spinal stenosis." (R. 475.)

On March 13, 2008, Plaintiff saw her treating physician Dr. Anderson after two months off work due to bronchitis. (R. 501.) At the visit, Plaintiff complained of

---

[4]     Schmorl's node is "prolapse of the nucleus pulposus through the vertebral body endplate into the spongiosa of an adjacent vertabra." STEDMAN'S MEDICAL DICTIONARY 1325 (28th Ed. 2006).

continuing chronic pain and headaches, nausea, and abdominal pain, but did not want to continue going to a pain clinic she had been attending. (R. 501.) Dr. Anderson's notes reflected that he "told her 2 months even for bronchitis is plenty of time off of work." (R. 501.) Plaintiff requested a lifting restriction of five pounds, but Dr. Anderson told her he was not sure why a lifting restriction would be needed after bronchitis. (R. 501.) After Plaintiff said she did not feel like she would be able to lift more than about five pounds, he put her on a ten-pound lifting restriction, but noted that the restriction "need[ed] to be re-evaluated relatively soon as that should not really be an issue." (R. 501.) Dr. Anderson filled out a form for Plaintiff "extending her leave yet again." (R. 501.)

On April 4, 2008, Plaintiff saw Dr. Anderson for a routine physical. (R. 505.) Dr. Anderson noted that Plaintiff had seen three or four pain specialists who had not told Plaintiff a cause for her pain, but explained to her that the chronic pain clinic's job was to get her pain under more reasonable control rather than find the answer. (R. 505-06.) Plaintiff was noted to have normal station and gait. (R. 507.) Dr. Anderson thought Plaintiff was developing depression and started her on Zoloft, which she did not end up taking for long. (R. 505-07, 515.)

Plaintiff continued to see Dr. Anderson regularly prior to the alleged onset date of January 1, 2009, and he continued to note chronic pain. (R. 508, 510, 513, 515, 607.) On May 23, 2008, he noted that Plaintiff had stopped attending the pain clinic. (R. 508-509; *see* R. 510 ("I sent her to 2 different chronic pain clinics, neither of which she will continue to go to. Transportation was a problem, time was a problem. This was mostly for chronic pelvic pain.").) In a note dated November 7, 2008, Dr. Anderson stated that

Plaintiff was having right thumb pain from tendinitis and noted that Plaintiff had a wrist splint. (R. 607.) Dr. Anderson told Plaintiff that she needed to wear the wrist splint more. (R. 607.) He also referred her to occupational therapy. (R. 607.)

Plaintiff saw Dr. Anderson on January 8, 2009 with "a 1-week history of sinus pain, pressure, congestion, cough, chest pain, rhinorrhea, headaches." (R. 616.) At the visit, Plaintiff had normal station and gait. (R. 618.) Plaintiff was given antibiotics and instructed to continue her other medications for ongoing issues. (R. 616, 618.)

On April 8, 2009, Plaintiff saw Virginia L. Kakacek, M.D., for right foot pain. (R. 620.) Plaintiff reported that a week earlier, while walking her dog, "she felt her foot become unsteady" and "twisted it slightly." (R. 620.) "She finished the walk, came home, and noticed it was uncomfortable. It has continued to hurt since then. It was a deep throbbing. She has noticed that it was a little bit swollen." (R. 620.) Dr. Kakacek noted that Plaintiff "walks with a slight limp." (R. 620, 622.) Plaintiff was determined to have a right foot strain. (R. 622.) She was offered a "CAM [controlled ankle motion] walker" with complete weight restriction but declined in favor of a surgical shoe. (R. 622.) Plaintiff was instructed to ice and elevate and was prescribed Vicodin. (R. 622.) An x-ray of the right foot revealed that "[t]he bones are intact, with no evidence of fracture." (R. 586.)

Plaintiff followed up with Dr. Anderson on April 20, 2009 about her right foot. (R. 624.) Plaintiff was still in pain, so Dr. Anderson gave her a refill of Vicodin for the pain. (R. 624.) Dr. Anderson noted that Plaintiff had not been resting her injured foot, but instead "has been walking 3 times a day since she does not have a job now and is

trying to lose weight." (R. 624.) He prescribed a CAM walker. (R. 626.) Aside from

some kidney pain, Dr. Anderson stated that her other medical issues were stable. (R.

626.)

Plaintiff saw Dr. Anderson on June 17, 2009 for "sinus pain and pressure,

congestion, rhinorrhea, headaches, ongoing right foot pain, also some right ankle pain

and some right hip pain." (R. 628.) Dr. Anderson thought that the hip pain was caused

by her walking differently due to her right foot pain. (R. 628.) Dr. Anderson gave her

antibiotics for the cough and Vicodin for her pain. (R. 629.) Dr. Anderson referred

Plaintiff to physical therapy for plantar fasciitis, muscular hip pain, and ankle pain. (R.

629.)

On July 7, 2009, Plaintiff returned to Dr. Anderson after falling in her yard. (R.

630.) "She was out in her yard. She had turned awkwardly to one side and then her dog

knocked her down. She has pain in her left ankle and left knee. Also had a bruise on her

left hand, but that is not as painful. She notes plantar fasciitis of her right foot is almost

completely resolved at this point." (R. 630.) Plaintiff had an Aircast at home, and Dr.

Anderson directed Plaintiff to wear the Aircast on her left ankle. (R. 631.) She preferred

an Ace wrap at times, so Dr. Anderson gave her one. (R. 631.) Plaintiff was also given

Vicodin for pain. (R. 631.) X-rays taken of her left knee and ankle were normal. (R.

587, 631.)

Plaintiff next saw Dr. Anderson on August 25, 2009 with "worsening low back

pain over the past week." (R. 632.) Dr. Anderson noted that Plaintiff "does have chronic

back pain since a car accident in 1988." (R. 632.) Plaintiff thought "she was lifting

something that was too heavy and had the onset of the low back pain, mostly in the midline." (R. 632.) Dr. Anderson gave Plaintiff Vicodin for the pain and told her to continue to ice, which was helping. (R. 633.) He also noted that foot pain had been an "intermittent problem" for Plaintiff. (R. 632.) Plaintiff declined physical therapy. (R. 633.)

Plaintiff saw Dr. Anderson on September 23, 2009 suspecting she may have a hernia. (R. 634.) Plaintiff felt something along the incision line of her previous hysterectomy. (R. 634.) "Pain can be in the midline or either to the right or left of that. Also has pain in the low back and right hip. Not clear if these pains are all related." (R. 634.) At her request, Dr. Anderson renewed Plaintiff's Vicodin for pelvic pain and back and hip pain. (R. 634-35.) Dr. Anderson noted normal gait and station. (R. 635.) Dr. Anderson referred Plaintiff to urogynecology to reevaluate Plaintiff's pelvic pain and assess for hernia. (R. 635.) At the December 15, 2017 hearing, Dr. Anderson testified that looking just at the objective section of his treatment notes (i.e., ignoring subjective complaints), he would not consider Plaintiff to be limited to a sedentary level of work.[5] (R. 204-05.)

On October 16, 2009, Plaintiff saw Michael T. Valley, M.D., regarding her pelvic pain and possible hernia. (R. 636.) Plaintiff declined a pelvic examination, but permitted

---

[5]     "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

examination of her abdomen.  (R. 637.)  Dr. Valley was not able find evidence of a hernia in his examination.  (R. 637.)  Dr. Valley noted that he would have encouraged physical therapy to strengthen the pelvic floor and work on the low back pain, but Plaintiff stated physical therapy would not be covered by her insurance.  (R. 637.)  She also stated she was not able to go to physical therapy for her foot pain due to lack of insurance coverage.  (R. 637.)  Dr. Valley ordered a CT scan of the abdomen and pelvis.  (R. 637.)  The CT scan found "[n]o CT evidence for ventral or inguinal hernia."  (R. 591.)

On December 17, 2009, Plaintiff saw Dr. Anderson for right hip pain and a head cold.  (R. 640.)  Plaintiff said that her hip got worse with standing or walking.  (R. 640.)  Since it had been several years since the last hip x-ray, Dr. Anderson ordered an x-ray of the hip.  (R. 640.)  The x-ray found the "[p]elvis and right hip within normal limits."  (R. 595.)  Dr. Anderson noted: "She is planning on starting to use a cane."  (R. 640.)  Plaintiff testified that the cane was her mother's.  (R. 71.)  Dr. Anderson renewed Plaintiff's Vicodin and prescribed antibiotics.  (R. 641.)  Dr. Anderson testified at the hearing that based on the objective section of his notes alone, he would not consider Plaintiff limited to sedentary work.  (R. 199-200.)

On January 26, 2010, Plaintiff again saw Dr. Anderson with a cough.  (R. 642.)  Dr. Anderson again prescribed antibiotics and, at Plaintiff's request, re-prescribed Vicodin for "the sinus pain and her other aches and pains."  (R. 642-643.)  Plaintiff declined a chest x-ray but said she would return for one if her symptoms persisted.  (R. 643.)

Plaintiff returned on March 4, 2010 to Dr. Anderson with "another bout of bronchitis." (R. 644.) Plaintiff requested more Vicodin "for chronic hip pain and also for right toe pain." (R. 644.) Plaintiff also "dropped a case of pop on her foot" but would not allow Dr. Anderson to examine the foot. (R. 644.) In the objective portion of his notes, Dr. Anderson noted that plaintiff was walking with a cane. (R. 645.) Dr. Anderson prescribed antibiotics and refilled her Vicodin. (R. 645.)

Plaintiff had her physical examination with Dr. Anderson on March 31, 2010. (R. 646.) Plaintiff "continue[d] to have numerous chronic pains." (R. 646.) Plaintiff noted having neck pain, hip pain (right more than left), and pelvic pain. (R. 646.) Dr. Anderson noted normal station and gait and that a recent x-ray of the hips was normal. (R. 646-647.) Plaintiff requested an ultrasound of her hips, which Dr. Anderson explained he did not do. She also requested an ultrasound of her abdomen and pelvis region, which showed "[n]o abnormal masses or definite free fluid collections in the pelvis." (R. 599, 646.) Dr. Anderson renewed Plaintiff's Vicodin "but told her that we will not use this long-term." (R. 646.)

On May 25, 2010, Plaintiff saw Dr. Anderson with a 4-day history of productive cough. (R. 648.) Plaintiff told Dr. Anderson that her low back pain had "flared up recently." (R. 648.) "They had a tree that was down in their yard and had to clean that up. She did have some Vicodin left over, and those have been helping." (R. 648.) Dr. Anderson prescribed an extended-course antibiotic and renewed Plaintiff's Vicodin. (R. 649.)

Plaintiff's next bout of bronchitis occurred on September 1, 2010. (R. 650.) In addition, she described "pain on the top of her right foot." (R. 650.) Dr. Anderson continued:

> She twisted that on July 4 in her driveway. Pain did not start right away; it sounds like a strain. She has continued to try and be active; walks daily. Just started school and has to do quite a bit walking for that. Discussed this will slow down her healing. She does not do well with either anti-inflammatories or Tylenol. Does do okay with Vicodin. I gave her a new prescription today.

(R. 650.) Dr. Anderson also prescribed two courses of antibiotics, "which is what it usually takes to resolve her bronchitis." (R. 651.) Dr. Anderson stated in the objective portion of his notes that she "walks with a slight limp and her cane." (R. 651.)

On October 20, 2010, Plaintiff saw Dr. Anderson "after reinjuring her right foot." (R. 652.) "She twisted it the wrong way when walking her dog. Still had not recovered from the previous injury. She has been wearing a cam walker but cannot wear that when she is out of the house and has to do a lot of walking to and from school at work. Vicodin works well for the pain, requests more of that." (R. 652.) Dr. Anderson believed that Plaintiff "likely ha[d] another foot sprain and ankle sprain." (R. 653.) He gave Plaintiff an Aircast, renewed her Vicodin, and ordered an x-ray to rule out any bony abnormalities. (R. 653.) The x-ray found "[n]o acute bone or joint abnormality" but "some scattered degenerative changes to the foot [we]re present." (R. 600.)

On December 3, 2010, Plaintiff had another productive cough and noted continued right ankle pain. (R. 654.) Dr. Anderson noted that Plaintiff reinjured the ankle the week prior. (R. 654.) "She does not feel that the Aircast was enough support, so now she is wearing a boot." (R. 654.) Dr. Anderson renewed her Vicodin prescription for her ankle

pain at her request.  (R. 655.)  "Offered to refer her to Orthopedics or for physical therapy and  she would like to [sic] the former, she will check with insurance first."  (R. 655.)  He recommended that she wear the boot, "although she does not wear [the boot] when she goes to school and she does a fair amount of walking there."  (R. 655.)  Dr. Anderson "recommended she wear the Aircast at that time."  (R. 655.)  He believed that physical therapy would be appropriate later if Plaintiff was willing.  (R. 655.)

Plaintiff's next visit with Dr. Anderson was on January 18, 2011 for productive cough.  (R. 656.)  Dr. Anderson noted normal gait and station.  (R. 657.)  He gave Plaintiff a "limited supply of some Vicodin for the headaches associated with sinusitis. She understands that this is short-term."  (R. 657.)

On February 16, 2011, Plaintiff saw Dr. Anderson with right knee pain and swelling after a fall two days earlier.  (R. 658.)  "She was helping her husband take the fish house off the lake.  She slipped and fell directly onto the right knee.  Has been using Vicodin for the pain, and that is helping.  She has been using some ice for the swelling. Also has lesser pain on the left knee."  (R. 658.)  Dr. Anderson noted that Plaintiff did not permit much examination of the right knee.  (R. 659.)  He noted a slight limp in Plaintiff's walk.  (R. 659.)  He also gave Plaintiff a new prescription for Vicodin.  (R. 659.)  Dr. Anderson testified at the hearing that because of the slight limp, Plaintiff was limited to sedentary work based on the objective evidence.  (R. 163-64.)

Plaintiff next went to Dr. Anderson on March 24, 2011 for another fall, which injured her left wrist.  (R. 660.)  "She was going up the stairs, stumbled and fell on her outstretched arm.  She is worried that she has a fracture.  Pain has not been getting much

better.  Also has a little pain up the forearm and into the elbow.  Also since scheduling the appointment she has developed a cough."  (R. 660.)  Dr. Anderson prescribed antibiotics for the cough.  (R. 661.)  Dr. Anderson noted normal station and gait.  (R. 661.)  He noted Plaintiff "holds the left wrist relatively stiff and straight."  (R. 661.)  "There is some minimal tenderness over the dorsum.  Strength and range of motion limited only by discomfort."  (R. 661.)  Dr. Anderson ordered an x-ray for the left wrist, which found no acute fracture or other abnormality.  (R. 601, 661.)  Dr. Anderson placed the left wrist in a splint, which Plaintiff could "wear [] as needed for comfort."  (R. 661.)

Plaintiff had her next physical on April 7, 2011 with Dr. Anderson.  (R. 662.)  Dr. Anderson noted normal gait and station and did not reference Plaintiff's pain.  (R. 662-63.)

On May 25, 2011, Plaintiff returned with "numerous issues."  (R. 664.)  Plaintiff's left wrist was continuing to give her pain.  (R. 664.)  "She reinjured it recently, just twisted something.  I again recommended hand therapy.  She states she cannot afford it right now.  She has a wrist splint, which I recommended she continue to use.  She will continue her Vicodin as needed."  (R. 664.)  She also complained of right knee pain, for which Dr. Anderson ordered an x-ray.  (R. 664.)   Plaintiff complained of pelvic pain, and Dr. Anderson noted that she "[h]as been evaluated by several specialists, and no one can really come up with a specific diagnosis or treatment plan for that."  (R. 664.)  Plaintiff had normal gait and station.  (R. 665.)  Dr. Anderson noted that he "[w]ould like to get her off [Vicodin] as soon as possible, but with the various different pain complaints, I do not think now is the time.  Certainly will not continue to use this long-

term for the pelvic pain, which is chronic."  (R. 665.)  Dr. Anderson testified at the

hearing that in his opinion, Plaintiff was limited to sedentary work at this visit.  (R. 167.)

Plaintiff's right knee x-ray found "[n]o bone or joint abnormality."  (R. 604.)

On June 29, 2011, Plaintiff saw Dr. Anderson after another fall.  (R. 666.)  Dr.

Anderson stated that Plaintiff "has had a longstanding problem with gait instability,

balance issues, and falls."  (R. 666.)  Plaintiff "hit her head and neck.  Saw stars but did

not lose consciousness.  Does not have any post concussive symptoms."  (R. 666.)

Plaintiff continued to have "numerous musculoskeletal pain issues, many of which she

had even before the fall."  (R. 666.)  These included low back pain, posterior neck pain

and right knee pain.  (R. 666.)  Dr. Anderson renewed Plaintiff's Vicodin as she was

almost out and she had requested more.  (R. 666.)  Dr. Anderson noted that when he

"started the musculoskeletal exam, she said she was having too much pain for me to

examine and refused the rest of the exam."  (R. 667.)  Dr. Anderson "[r]eferred [Plaintiff]

to Physical Therapy for the gait instability, balance issues, and multiple musculoskeletal

complaints."  (R. 667.)  He also gave her new Ace wraps "which she has been wearing on

her wrists, which also hurt more since the fall."  (R. 667.)

On September 16, 2011, Plaintiff saw Dr. Anderson for bilateral flank pain that

she thought may be a kidney stone.  (R. 668.)  Plaintiff was tender on exam, and Dr.

Anderson did not think she had a kidney stone.  (R. 668.)  Dr. Anderson referred Plaintiff

to an endocrine specialist.  (R. 668.)  Dr. Anderson refilled Plaintiff's Vicodin at her

request.  (R. 668.)

Two weeks later, Plaintiff came back with a two-week history of cold symptoms including "cough with some chest pain, congestion, sinus pain, pressure congestion, slight sore throat." (R. 670.) Dr. Anderson noted that Plaintiff had not followed through with the kidney stone protocol from the previous visit. (R. 670.) Dr. Anderson noted that Plaintiff continued to have some left wrist pain. (R. 670.) He noted that she had an Ace wrap on the wrist. (R. 671.)

On December 9, 2011, Plaintiff went to Dr. Anderson related to a productive cough. (R. 672.) Dr. Anderson also noted: "She continues to fall intermittently. She most recently has hurt her left wrist. She has it wrapped today. She lost her brace. At some point she says she wants to repeat the x-ray, but not today." (R. 672.) Dr. Anderson noted normal station and gait and that her left wrist was wrapped in an Ace wrap. (R. 673.)

Plaintiff next visited Dr. Anderson on February 28, 2012 "to discuss numerous issues." (R. 674.) She again had cold symptoms, but also had neck pain, ongoing left knee pain, leg pain, foot pain, and problems with her wrist. (R. 674.) Plaintiff had hit her left knee and foot against a metal chair a couple of weeks earlier. (R. 675.) Dr. Anderson noted that Plaintiff had lost her wrist brace and was still having problems with her left wrist. (R. 674.) Plaintiff had normal station and gait. (R. 675.) Plaintiff wanted to have x-rays of her "knee, leg, ankle and foot." (R. 675.) Dr. Anderson ordered just an x-ray of the tibia and fibula because she had a recent knee x-ray and the "tib-fib film should include enough of the knee and ankle to see if there [were] any significant changes." (R. 675.) The x-ray was normal and showed no fracture. (R. 611.)

Plaintiff had her next physical on April 11, 2012. (R. 676.) Plaintiff was alert, cooperative, and in no distress. (R. 676.) Plaintiff had "normal strength, sensation and reflexes." (R. 676.) Dr. Anderson did not note Plaintiff's pain, nor the presence of a wrist splint or wrap. (R. 676-77.)

On May 22, 2012, Plaintiff saw Dr. Anderson for preop for surgery on her left eye for a presumed neoplasm. (R. 678.) Plaintiff was cleared for the surgery, but Dr. Anderson noted she "[c]ontinues to have significant pain issues, including her wrist, chronic pelvic pain, some lower extremity pain, but the rest of her complete review of systems was negative." (R. 678.)

On June 12, 2012, Plaintiff returned with another several-day cough. (R. 680.) Plaintiff requested more pain medication for generalized pain. (R. 680.) Dr. Anderson noted he "believe[d] low back pain is a significant component." (R. 680.) He noted normal station and gait. (R. 681.) Dr. Anderson prescribed antibiotics for the cough and instructed her to rest. (R. 681.) His notes state: "She has never overused the Vicodin." (R. 680.)

On July 18, 2012, Plaintiff saw Dr. Anderson and said that about three weeks earlier, she tripped over something and hurt her right knee, but did not remember exactly how it happened. (R. 685.) Dr. Anderson reported that she did not have lightheadedness or dizziness. (R. 685.) Plaintiff had pain and swelling over the knee. (R. 685.) She requested an x-ray. (R. 685.) The x-ray was within normal limits. (R. 617.)

Plaintiff fell off her bike on August 11, 2012 and saw Dr. Anderson five days later. (R. 687.) Dr. Anderson reported:

> She was thinking about her dog that just died. Went over a bump and flew off the bike. She landed on the left side of her body. Has had some pain over the left arm, wrist, hand, left thigh, and also the left lower abdomen and pelvis area. She does have chronic pelvic pain anyway and also complains that she is having some problems with her "sling." She had surgery with Dr. Enriquez of Urogynecology. I asked her to call their department and see 1 of the other doctors for followup of that. She did not hit her head, did not lose consciousness. Has not had headaches or chest pain, shortness of breath, etc. She does think that she is getting bronchitis back as she started having a productive cough and she is very prone to bronchitis.

(R. 687.) Dr. Anderson "renewed her Vicodin for her various pains associated with the fall." (R. 688.) Dr. Anderson "reassured her that it does not look like she did any serious damage." (R. 687.)

On August 30, 2012, Plaintiff returned for a follow-up visit after the fall from her bicycle and to check on her bronchitis. (R. 689.) Plaintiff was concerned about a lump in her lower abdomen/pelvic area that she had not noticed at the prior visit. (R. 689.) She was "still a little sore, but [was] otherwise recovering well." (R. 689.) "She still had some Vicodin on hand for chronic knee pain and some other pains and [Dr. Anderson] told her she can use that for the hematoma, that it may take weeks to months to resolve." (R. 689.) Dr. Anderson noted normal station and gait. (R. 690.) He recommended heat and observation for the hematoma. (R. 690.) Dr. Anderson testified at the hearing that his findings that day were consistent with someone who got a later diagnosis of fibromyalgia and is consistent with a sedentary exertion level. (R. 181-82.)

On October 30, 2012, Plaintiff saw Dr. Anderson regarding intermittent vaginal bleeding and bronchitis. (R. 693.) Dr. Anderson noted normal station and gait. (R. 694.)

Plaintiff had her gynecology appointment on November 14, 2012. (R. 695.) Plaintiff previously underwent a midurethral sling surgery in 2006. (R. 695.) At the gynecology appointment, she complained of pelvic pain and pain with intercourse. (R. 695.) She described her pelvic pain as suprapubic pain "as well as pain in the folds of her thighs." (R. 695.) She was "certain" that the sling caused the pain. (R. 695.) "She describes her pain as present all of the time and rates it '10/10' today. States that it feels both superficial and deep." (R. 695.) Plaintiff was in no acute distress. (R. 697.) Plaintiff requested that her sling be removed, but the physician told her "that her sling may be contributing to her pain but is unlikely the sole source." (R. 698.) They discussed alternatives to surgery, "including pelvic floor physical therapy, medication therapy and injections," but Plaintiff "vehemently decline[d] these options." (R. 698.) Dr. Anderson cleared Plaintiff for surgery on November 29, 2012. (R. 703.) On December 3, 2012, Plaintiff underwent surgery under spinal anesthesia to remove 1.5 cm of exposed mesh from the 2006 sling surgery. (R. 517-19.) Plaintiff was noted to have tolerated the procedure well. (R. 518.)

Plaintiff returned to Dr. Anderson on January 11, 2013 regarding a several-day history of productive cough typical of bronchitis. (R. 520.) Plaintiff wanted to get over the cough quickly because she was beginning school soon thereafter. (R. 520.) Dr. Anderson prescribed antibiotics and renewed Plaintiff's Vicodin for "the acute myalgias[6] and the more chronic knee pain." (R. 521.)

---

[6] At the hearing, Dr. Anderson testified that "myalgias" "doesn't really mean anything more than muscle pain." (R. 139-40.)

Plaintiff had a physical with Dr. Anderson on April 9, 2013. (R. 522.) Dr. Anderson noted that Plaintiff was still taking Vicodin for pain. (R. 522.) Plaintiff was alert, cooperative, and in no distress. (R. 522.)

On May 3, 2013, Plaintiff saw Dr. Anderson regarding left wrist pain, right hip pain, and chronic pelvic pain. (R. 524.) Plaintiff stated that for several weeks, she had experienced left wrist numbness and some pain. (R. 524.) She thought she might have hurt her left wrist in her sleep. (R. 524.) Dr. Anderson concluded that her history and exam were consistent with carpal tunnel syndrome. (R. 524.) Dr. Anderson noted that Plaintiff already had a wrist splint, which she was encouraged to wear as much as possible including at night. (R. 524.) Plaintiff declined hand therapy. (R. 524.)

On May 22, 2013, Plaintiff saw Yvonne M. Grierson, M.D., on referral from Dr. Anderson regarding her left wrist. (R. 526.) Plaintiff reported that she had felt the hand pain since her 1988 automobile accident, but that it was getting worse. (R. 526.) She also reported that she "ha[d] had trouble with her hand for about the last year to two." (R. 526.) On examination, Plaintiff's wrist extension was limited to about 20 degrees, flexion to 40 degrees. (R. 527.) Dr. Grierson thought Plaintiff likely had carpal tunnel syndrome and ordered an electromyography ("EMG"). (R. 527.) The EMG came back normal, with "no significant electrophysiologic evidence of a left median neuropathy, ulnar neuropathy, or cervical radiculopathy." (R. 528.) An x-ray of the left wrist was also unremarkable. (R. 619.) There was no evidence of fracture or dislocation. (R. 527.)

Plaintiff had a visit with Dr. Anderson on June 21, 2013 regarding a weeklong cough. (R. 529.) At the visit, Plaintiff also complained of continuing pelvic pain. (R.

529.)  On assessment, Plaintiff had normal station and gait.  (R. 530.)  Dr. Anderson

prescribed antibiotics and renewed her prescription for Vicodin for pain.  (R. 530.)  On

June 28, 2013, Dr. Grierson noted that Plaintiff needed a clinic visit for a carpal tunnel

injection.  (R. 531.)

On September 17, 2013, Plaintiff saw Dr. Anderson about various pains.  (R. 532.)

Dr. Anderson noted that Plaintiff had seen urogynecology regarding her chronic pelvic

pain and had the midurethral sling removed.  (R. 532.)  She continued to have pain, and

Dr. Anderson renewed her Vicodin prescription.  (R. 532.)  Plaintiff was also having

some hip pain and other aches and pains.  (R. 532.)

On October 30, 2013, Plaintiff saw Dr. Anderson about another round of

productive cough.  (R. 534.)  Dr. Anderson noted that Plaintiff's pain issues were

relatively stable.  (R. 534.)

Plaintiff returned with a several-day history of productive cough on December 19,

2013.  (R. 536.)  Plaintiff told Dr. Anderson that she was not getting as much sleep as she

should because "her puppy wakes her up in the middle of the night to go to the

bathroom."  (R. 536.)  Dr. Anderson prescribed antibiotics.  (R. 537.)  The note does not

mention Plaintiff's pain except that she will "[c]ontinue her current medications for other

ongoing medical issues."  (R. 537.)

Plaintiff's last day insured was December 31, 2013.  (R. 409.)

On July 8, 2015, Dr. Anderson completed a medical source statement in which he

checked a line indicating that in his opinion, Plaintiff was limited to a sedentary level of

work.  (R. 715.)  Dr. Anderson checked that Plaintiff could lift up to ten pounds

occasionally and less than ten pounds frequently. (R. 716.) He checked that Plaintiff could stand and walk (with normal breaks) less than two hours a day and could sit less than two hours a day. (R. 716.) Dr. Anderson checked that Plaintiff could sit for 30 minutes and stand for 15 minutes before changing position, must walk around for 5 minutes every 30 minutes and requires the opportunity to shift at will from sitting to standing/walking. (R. 717.) He also checked that she would need to lie down at unpredictable intervals. (R. 717.) Dr. Anderson checked that Plaintiff could never twist, crouch, or climb ladders, and could only occasionally stoop or climb stairs. (R. 717.) Dr. Anderson checked that reaching, handling, fingering, feeling, and pushing/pulling are affected by Plaintiff's impairments, and that she should avoid all exposure to extreme cold, extreme heat, wetness, humidity, noise, fumes, and hazards. (R. 718.) Finally, he checked that she would miss work more than three times a month. (R. 719.) At the visit where Dr. Anderson went over the forms with Plaintiff, Dr. Anderson noted that Plaintiff had normal station and gait. (R. 899.) He further noted: "She does walk with a cane." (R. 899.) He renewed a prescription that Plaintiff had for Norco at that visit.

On July 22, 2015, Plaintiff had a left wrist MR arthrogram, which showed "[s]mall full-thickness perforation within the articular portion" of the triangular fibrocartilage complex ("TFC") and "[m]oderate grade partial tearing of the full fetal attachment of the TFC." (R. 743.) Plaintiff was seen by Thomas M. Walsh, M.D., an orthopedic surgeon, on October 22, 2015. (R. 916.) Plaintiff wanted surgery on the wrist, but was informed by Dr. Walsh that the perforation is "normal in many individuals over the age of 40 or 50," that such perforations "are oftentimes not symptomatic or responsible in any way for

a person's wrist symptoms," that he "was not confident the [TFC] [was] the source of her pain," and that "[h]er symptoms certainly do not match" the conclusion that the TFC was the source. (R. 917-18.) Dr. Walsh would not perform surgery on the wrist and determined that "[h]er described symptoms and the symptom magnification seen on examination today suggest this is a complex pain picture, and not necessarily a mechanical problem with her wrist." (R. 917-18.) Plaintiff refused an offered injection and "left the office frustrated and angry" that Dr. Walsh would not perform surgery. (R. 918.) Dr. Walsh noted that the MRI shows that the intercarpal ligaments and bone signatures were normal in Plaintiff's left wrist. (R. 917.)

At a visit on August 4, 2015, Dr. Anderson noted that Plaintiff "may have fibromyalgia, although I do not believe she has been given that formal diagnosis." (R. 905.) As of May 24, 2017, Dr. Anderson stated that he "think[s] that she probably has" fibromyalgia, but Plaintiff had not been diagnosed with fibromyalgia. (R. 969.)

On August 28, 2015, Dr. Anderson completed another medical source form for Plaintiff. (R. 994.) He answered that: he had treated Plaintiff since 2000; Plaintiff has used a cane since 2011; the cane was prescribed by him;[7] Plaintiff had used an Aircast since 2010; and the Aircast was prescribed by him. (R. 994.) Dr. Anderson checked that as of December 31, 2013, Plaintiff was limited to less than sedentary work. (R. 994.)

---

[7]    Dr. Anderson testified at the hearing that it was most likely that he "didn't prescribe a cane but rather [] positively endorsed [Plaintiff's] declaration that she wanted to use one." (R. 116.)

On October 10, 2017, Dr. Anderson had a recorded conversation with Plaintiff's counsel regarding Plaintiff's ability to work.  (R. 996.)  Dr. Anderson stated that Plaintiff had worn a wrist brace or some form of sleeve on her wrist since her March 2011 fall. (R. 996.)  When asked about the 2015 MRI, Dr. Anderson stated that Plaintiff had "arthritic or degenerative changes" in her wrist that are "most likely related to the previous fall."  (R. 996.)  As of result of the wrist, Dr. Anderson stated that Plaintiff would have a lifting restriction of no more than ten pounds dating back to the March 2011 fall.  (R. 996.)  He stated that Plaintiff would have to limit use of her left wrist to occasional use or less.  (R. 996.)  He stated that the reason for Plaintiff's frequent falls was "myofascial pain syndrome, fibromyalgia, and that can affect, it causes not only pain but can also affect stability and balance and lead to falls.  I believe that is the reason, why she has her frequent falls."  (R. 997.)  Dr. Anderson answered: "Correct" when counsel asked: "And on December 12, 2009 you prescribed the use of a cane, is that correct?"  (R. 997.)  When asked if Plaintiff had used a cane "consistently" since December 12, 2009, Dr. Anderson responded: "Yes, she uses her cane.  She brings it in every time I see her." (R. 997.)  He stated that "she uses the cane for stability, but she does not have an abnormal [gait] in the sense that someone with Parkinson's Disease or someone with nerve palsy or some sort of specific problem like that would have.  It is not that she has an algetic or abnormal [gait], but she does require the cane for additional stability and help prevent more falls."  (R. 997.)  Dr. Anderson stated that Plaintiff would have a standing limitation of one to two hours in an eight-hour day, and may need breaks.  (R. 997.)  Dr. Anderson stated that he believed that "myofascial pain syndrome and

fibromyalgia" were the cause of Plaintiff's other pains such as pelvic pain, back pain, and foot pain. (R. 997.) He stated that Plaintiff would be limited to no more than sedentary work, limited by only occasional use of the left hand. (R. 997.) He stated that Plaintiff would definitely miss more than two days of work a month and "would say it would probably be upwards of seven or eight days a month" either due to problems with bronchitis, sinus problems or problems related just to pain and fatigue. (R. 998.)

Plaintiff testified at the hearing that she lost her job for reasons unrelated to her impairments. (R. 62-66.) Plaintiff testified that she had to take care of her husband during the relevant period before he died in 2016. (R. 67.) Plaintiff testified that she had previously received disability insurance through an insurance company after her 1988 car accident. (R. 68.)

At the hearing, Dr. Anderson testified that as far as he could remember, Plaintiff regularly used her mother's cane for visits. (R. 118.) He testified that he did not include the cane in his notes—aside from the two mentions—"because it became commonplace for her to have it and again, it's not a detail that would change anything as far as treatment or moving forward." (R. 120-121.) He testified that Plaintiff used the cane for stability because she had gait instability. (R. 121-122.) Dr. Anderson testified that Plaintiff's gait is noted only in some notes because sometimes he did not see her walk, but when he saw her walk he noted it. (R. 123.) Dr. Anderson testified that in his professional medical opinion, the totality of the records prior to December 31, 2013 indicate that Plaintiff is limited to sedentary work. (R. 186.) Dr. Anderson further testified that because of Plaintiff's wrist misalignment, he would not recommend that she

lift more than 25 pounds of force. (R. 187.) He also testified that Plaintiff would be an "outlier" in how she experiences pain in that her experience of pain is greater than a general group of people who have similar objective findings. (R. 188-189.)

### III.  <u>LEGAL STANDARD</u>

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions." *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)). The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.*

"A disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v.*

*Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)).  However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526–27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).

"[A] treating physician's opinion is given 'controlling weight' if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (alteration in original) (quoting *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002)).  However, an ALJ may properly "discount or even disregard the opinion of a treating physician where other medical assessments 'are supported by better or more thorough medical evidence' or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) (quoting *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997) and citing *Cruze v. Chater*, 85 F.3d 1320, 1324–25 (8th Cir. 1996)).  "A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." *Id.* (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)); *see also Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) ("However, '[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'") (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)) (alteration in original) (internal quotation omitted).  In any case, "the ALJ must 'always give good

26

reasons' for the particular weight given to a treating physician's evaluation." *Id.* (quoting 20 C.F.R § 404.1527(d)(2)).

An ALJ should consider several factors, in addition to the objective medical evidence, in assessing a claimant's subjective symptoms, including daily activities; work history; intensity, duration, and frequency of symptoms; any side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *5-7 (S.S.A. Mar. 16, 2016) (listing these factors as relevant in evaluating the intensity, persistence, and limiting effects of a person's symptoms). But the ALJ need not explicitly discuss each factor. *See Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005). "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citation omitted) (highly unlikely that ALJ did not consider and reject physician's opinion when ALJ made specific references to other findings set forth in physician's notes).

## IV. <u>DISCUSSION</u>

Plaintiff makes three challenges to the ALJ's determination. First, Plaintiff argues that the testimony and Plaintiff's medical treatment support an RFC of sedentary work. Second, Plaintiff argues that the ALJ did not give proper weight to Plaintiff's treating source opinion from Dr. Anderson. Third, Plaintiff alleges that the ALJ was biased. The Court addresses each argument in turn.

**A.      Testimony and Medical Treatment**

**1.      Standing Limitation**

Plaintiff first argues that her use of a cane supports a standing limitation.  (Dkt. 13 at 14.)  After considering the testimony of Plaintiff, her brother, and Dr. Anderson, as well as the medical record, the ALJ found that daily cane use by Plaintiff was not supported.  (R. 25.)  As explained below, the Court finds the ALJ's conclusion supported by substantial evidence.

Plaintiff testified that she believed she was prescribed a cane by Dr. Anderson in December 2009 and that the cane was her mother's.  (R. 69-71.)  Plaintiff and her brother both testified that she had been using the cane every day since 2009.  (R. 73, 86.)  Although Dr. Anderson agreed during his interview with Plaintiff's counsel on October 10, 2017, that he prescribed the use of a cane (R. 997), at the December 15, 2017 hearing, Dr. Anderson instead agreed that it was mostly likely that he did not prescribe a cane but rather positively endorsed her declaration that she wanted to use one (R. 116).  This positive endorsement is not reflected in his medical notes from that visit, which simply note Plaintiff "is planning on starting to use a cane."  (R. 640.)  He also testified that, as far as he could remember, Plaintiff used the cane regularly when he saw her between December 2009 and December 31, 2013 and that he did not recall ever seeing her without the cane from the time she started using it.  (R. 118.)

The first mention of the cane in the medical record is on December 17, 2009, nearly one year after the alleged onset date, when Dr. Anderson noted that Plaintiff "is planning on starting to use a cane."  (R. 640.)  As the ALJ noted, Dr. Anderson did not

prescribe a cane at that visit, nor did his treatment plan for Plaintiff include use of a cane. (R. 25, 640-641.) After the December 2009 reference to the cane, the only other references to a cane in the medical record before Plaintiff's insurance expired at the end of 2013 are in March 2010, when Dr. Anderson noted that Plaintiff "[w]alks with her cane" after she dropped a case of pop on her foot (R. 644-45), and September 2010, when he noted she "walks with a slight limp and her cane" when Plaintiff visited after twisting her ankle in her driveway (R. 651). During the same timeframe, Dr. Anderson noted Plaintiff's "[n]ormal station and gait" eleven times. (R. 530, 647, 657, 661, 662, 665, 673, 681, 690, 694.) Plaintiff argues that Dr. Anderson testified that he stopped mentioning the cane in his notes because it became commonplace. (Dkt. 13 at 14 (citing R. 158).)

The ALJ determined that the testimony from Plaintiff, her brother, and Dr. Anderson regarding cane usage was inconsistent with and not supported by the record because the record documents cane use only twice, because cane use was not part of Plaintiff's treatment plan or prescribed by a medical professional, and because Dr. Anderson noted that Plaintiff had normal gait and station and considered referring her to physical therapy at the visit where she said she intended to start using a cane. (R. 25.) The ALJ also found: "Reviewing Dr. Anderson's treatment notes, which actually are quite detailed, it is not believable that claimant had a cane in her possession during all doctor's visits when she made orthopedic complaints and yet it did in fact appear only twice. Moreover, he demonstrated that his notes are more clear than his memory." (R.

27.)  The ALJ also noted that there is "never an objective finding of gait imbalance" in the record.  (R. 27.)

To the extent the evidence regarding Plaintiff's use of a cane is conflicting, the ALJ is in a better position than the Court to gauge credibility and resolve conflicts in the evidence, including relating to Dr. Anderson's live testimony before the ALJ, Dr. Anderson's memory of Plaintiff's treatment, and Dr. Anderson's treatment notes.  *See Nash*, 907 F.3d at 1090 ("This court will not substitute its opinion for the ALJ's, who is in a better position to gauge credibility and resolve conflicts in evidence.") (quoting *Travis*, 477 F.3d at 1041).  Moreover, the ALJ explained his reasons for finding Plaintiff's, her brother's, and Dr. Anderson's testimony inconsistent with the medical record.  The ALJ's decision was based on the fact that the cane was not prescribed by a doctor, cane usage was only documented twice in the medical record, and Dr. Anderson's treatment notes repeatedly indicated Plaintiff had normal gait and station.  *See Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2016) ("Here, Dr. Garlapati notes in the MSS that Toland uses a 'medically required hand-held assistive device . . . for ambulation.'  But on October 28, 2010—Dr. Garlapati's most recent recorded appointment with Toland—he stated she was 'ambulating without assistance.'  There is no evidence in the record that he or any other physician prescribed Toland a cane or other assistive device for walking.  Although Toland reported using a cane 'when [her] back is having muscle spasms,' she confirmed it was not prescribed by any physician.").  Further, as the ALJ noted, Dr. Anderson's treatment notes from the December 17, 2009 visit when Plaintiff stated she was planning to start using a cane show that he planned to refer Plaintiff to physical

therapy if the x-ray of her right hip was normal, which it was. (R. 640-41; R. 595.) "A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). The Court finds that the ALJ's determination regarding the lack of a standing limitation due to cane use is supported by substantial evidence.

Plaintiff next argues that a standing limitation is "supported by the numerous falls that were both testified to and that were present throughout the records." (Dkt. 13 at 14.) The ALJ addressed each of the seven documented falls in the record and noted that the circumstances of six of the falls were the result of Plaintiff walking her dog, getting knocked down by her dog, helping her husband with his fish house on the lake, tripping over something, and falling off her bike while distracted.[8] (R. 24-25.) The ALJ noted that "[t]hese circumstances would be quite normal for individuals not alleging physical impairments and do not provide compelling evidence of a balance/instability issue." (R. 25.) Only the fall in June 29, 2011 involved unknown circumstances. (R. 25.) The ALJ also noted that there is no objective finding of gait instability in the medical record. (R. 27.) The ALJ's finding that these falls do not indicate gait instability is supported by substantial evidence.

---

[8] Plaintiff argues that a person may have had "numerous falls that do not get documented in medical records." (Dkt. 13 at 14.) Attorney argument is not evidence, and this argument does not justify reversal of the ALJ's conclusion regarding Plaintiff's RFC.

Finally, Plaintiff argues a standing limitation is supported by the objective medical findings, including "numerous examinations which show swelling of the knee and leg, reduced range of motion of the knee and leg and imaging that includes degenerative changes to the knee and foot." (Dkt. 13 at 15 (citing R. 195, 196, 838, 840, 842, 847, 855).) The cited portions of the record, however, are from examinations that occurred soon after Plaintiff's falls, and contemporaneous x-rays were normal. (*E.g.*, R. 620, 624, 628, 837-838, 839-840, 841-842). One examination after Plaintiff fell off her bike noted normal gait and station. (R. 841-42.) Two other examinations, one after Plaintiff rolled her ankle, and the other after she fell on her knee, noted "No instability" of the injured extremity (R. 626, 838). The Court finds that substantial evidence supports the ALJ's determination that Plaintiff could stand for six hours in an eight-hour day. For example, the repeated references to "[n]ormal station and gait" (R. 530, 647, 657, 661, 662, 665, 673, 681, 690, 694) and the many normal x-rays (R. 586, 587, 595, 600, 604, 611) support the ALJ's determination.

### 2.  Lifting Limitation

Plaintiff argues a lifting limitation is supported by her complaints of wrist pain, objective medical findings, and her use of a brace. (Dkt. 13 at 15.) As to Plaintiff's subjective complaints of wrist pain, the ALJ properly discounted those complaints as inconsistent with the record. Plaintiff's fall that led to the wrist injury occurred in March 2011, but the x-ray confirmed there was no fracture. (R. 661.) It was more than two years later when Dr. Anderson suspected that she may have carpal tunnel syndrome and he ordered another x-ray which was similarly unremarkable. (R. 619.) The EMG came

back normal, with "no significant electrophysiologic evidence of a left median neuropathy, ulnar neuropathy, or cervical radiculopathy." (R. 528.) The June 2015 MR arthrogram that found perforation and partial tearing was described by Dr. Walsh, an orthopedist, to be "normal in many individuals over the age of 40 or 50" and who was "not confident" that the TFC perforation was the source of her wrist pain. (R. 917-18.)

Plaintiff testified that she has used a wrist brace after the March 2011 fall unless she was in the shower and that she was wearing "[e]xactly the same one from then, 2011." (R. 76-78.) Dr. Anderson also stated that Plaintiff had worn a wrist brace or some form of sleeve on her wrist since her March 2011 fall. (R. 996.) The ALJ found these statements not consistent with the record because the record showed she had worn a wrist split or wrap until about February 2012 and she was not prescribed another brace or wrap again. (R. 25; *see also* R. 672 (noting Plaintiff had lost brace and wrist was wrapped during December 9, 2011 visit), R. 674 (noting Plaintiff had lost brace as of February 28, 2012 visit).) There are no further references to Plaintiff wearing a brace or a wrist wrap except that in May 2013, she was encouraged to wear a wrist splint (which she already had) as much as possible to address left wrist numbness and pain that she had been experiencing for several weeks and that Dr. Anderson thought was consistent with carpal tunnel syndrome. (R. 524.) The Court finds that the ALJ properly weighed the evidence about Plaintiff's wrist brace. *See Nash*, 907 F.3d at 1090. For these reasons, the Court finds that the ALJ's determination as to Plaintiff's ability to lift is supported by substantial evidence.

Finally, Plaintiff argues that the fact that she has been taking Vicodin since 2009 supports a lifting and standing limitation. The record reveals, however, that Plaintiff took Vicodin for a variety of complaints, including pelvic pain, headaches, lower back pain, sinus pain, and short-term injuries. (R. 532, 622, 629, 638, 642, 650, 652, 657.) Further, Dr. Anderson noted several times that Plaintiff's Vicodin usage should only be for the short term. (R. 622, 646, 657, 665, 667.) The Court concludes that Plaintiff's Vicodin usage does not provide grounds for reversing the ALJ's RFC determination.

## B. Treating Source Statement

Plaintiff next argues that the ALJ erred in giving little weight to the opinions of Dr. Anderson because his opinion was "detailed and subject to significant questioning" and based on "many factors including objective medical findings (including examinations, tests and imaging), subjective complaints of pain, medications used for pain, and his detailed understanding of his patient and the limitations she has faced since 2009." (Dkt. 13 at 17.) In his three opinions, Dr. Anderson stated that Plaintiff was limited to sedentary work or less than sedentary work. (R. 715-19, 994-95, 996-98.) Regarding Dr. Anderson's opinions, the ALJ stated:

> Little weight is given to the opinions of Dr. Anderson. His opinion forms were completed with claimant's input and may not be an accurate reflection of the doctor's objective observations. She saw Dr. Anderson on July 8, 2015. (Ex. 2F/98). She had forms for disability and they went over them that day. She was tender over the posterior neck, upper back and low back. She had normal gait and station. He wrote, "she does walk with a cane." He referred her to Orthopedics and Physical Medicine for follow up. (Ex. 2F/98). On August 28, 2015, claimant met with Sean Anderson, MD, to go over a form for disability. (Ex. 7F/123). They went through it together. They wanted to know how long she had used the cane. She said she thinks it was prescribed by him in 2011. He also prescribed the wrist splint in 2010.

At this point, she told him that she does not feel she can do any kind of work even sedentary work and cannot lift even ten pounds. He concurred with her self-assessment of her work ability. (Ex. 7F/123). At this visit, he noted that she reported twisting her ankle yesterday while mowing the lawn. (Ex. 7F/124). He did not examine the left wrist. She had moderate tenderness over the spinal musculature. (Ex. 7F/ 124). This evidence as well as his own testimony shows that he has a long-term relationship with the claimant and is invested in her care.

Dr. Anderson testified that his objective treatment notes required detail. For example, he said his treatment notes are his only record of past treatment and that he is [sic] treated thousands of patients over the years. He also indicated that it was important to be consistent in the objective portion of notes especially when giving treatment for similar maladies. For example, when treating a respiratory complaint, it would be important to have very clear notes about the respiratory findings. Similarly, when treating orthopedic complaints it would be important to be consistent in the objective findings pertaining to gait, strength or station. Reviewing Dr. Anderson's treatment notes, which actually are quite detailed, it is not believable that claimant had a cane in her possession during all doctor's visits when she made orthopedic complaints and yet it did in fact appear only twice. Moreover, he demonstrated that his notes are more clear than his memory. When discussing gait imbalance, the doctor said that if he observed it, it would be in his objective findings and yet, with the exception of his findings in the immediate aftermath of specific injuries, there is simply never an objective finding of a gait imbalance. This is similarly true for the wrist splint. Finally, the doctor opined that the claimant's fibromyalgia was present before the date last insured but he admit [sic] that he is not even qualified to make that diagnosis much less project it back into the past. Most significantly, Dr. Anderson admitted that claimant was an outlier in terms of her subjective complaints when compared to her objective findings and removing the subjective complaint portions of her notes, he would not opine a sedentary residual functional capacity if he was simply a reviewing consultant.

(R. 26-27.)

The Court finds that the ALJ gave "good reasons" for the weight assigned to Dr. Anderson, including that his opinions are not consistent with the medical evidence, that Plaintiff's subjective complaints are not consistent with the objective findings, and that Dr. Anderson is not qualified to diagnose Plaintiff for fibromyalgia in the past.

First, as discussed above, there are numerous inconsistencies between Dr. Anderson's opinion that Plaintiff is limited to sedentary work and the medical record. "A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker*, 459 F.3d at 937; *see also Stormo v. Barnhart*, 377 F.3d 801, 805-06 (8th Cir. 2004) (finding that the opinions of treating physicians "are given less weight if they are inconsistent with the record as a whole"). As noted above, Plaintiff was found to have normal station and gait on multiple visits spanning the relevant period from 2009 to 2013. (R. 530, 618, 635, 647, 657, 661, 662, 665, 673, 681, 690, 694.) In contrast, Dr. Anderson noted gait instability only once, in his subjective findings on June 28, 2011. (R. 666.) Aside from appearing ill at her visits due to a cough, Plaintiff was often in no acute distress at the visits despite her complaints of pain. (*E.g.*, R. 522, 676, 697.) Dr. Anderson's conservative treatment in only prescribing pain medication for Plaintiff's impairments is also inconsistent with a restriction to sedentary work. (R. 630 ("She did have some Vicodin left over, and those have been helping.").) That a condition can be controlled with "routine, conservative medical treatment" weighs against finding it disabling. *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016). Additionally, Plaintiff had many x-rays which came back normal. (R. 586, 587, 595, 600, 604, 611.)

Second, Dr. Anderson testified that his opinion that Plaintiff is limited to sedentary was based largely on Plaintiff's subjective complaints. "[A]n ALJ need not give a treating physician's opinions controlling weight when the opinion is based on a claimant's subjective complaints that [the] ALJ does not find credible." *See Vance v.*

*Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017). The ALJ found that Plaintiff's subjective complaints were not consistent with the record. (R. 27 ("After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements as well as the statements of her brother, Mr. Hansen, concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.").) As discussed above, Plaintiff's subjective complaints are not consistent with the medical evidence. In addition, her subjective complaints are not consistent with her work history or activities of daily living. Plaintiff testified that many of her impairments date back to her car accident in 1988 (R. 67-68), yet she worked at a medium level as a hand packager until she stopped working for reasons unrelated to her impairments (R. 62-66). Plaintiff's activities of daily living, including walking her dog (R. 620, 630, 652), taking care of her ailing husband (R. 67), helping her husband move a fish house on the ice (R. 658), biking (R. 687), mowing the lawn (R. 572), cleaning up a downed tree (R. 648), caring for a new puppy (R. 536), and attending college (R. 650) are inconsistent with her subjective complaints. The ALJ properly considered these activities in his assessment.

Third, the ALJ gave a good reason for discounting Dr. Anderson's statement that he believed she had fibromyalgia, since he said that he was not qualified to make such a diagnosis. (R. 147 ("I'll tell you. I specifically do not make the diagnosis of fibromyalgia. I never would admit someone to that diagnosis without having them see a

specialist and have that diagnosed, so that's why I sent her to the rheumatologist to . . . confirm a diagnosis.").)  Here, there is no diagnosis of fibromyalgia during the 2009 to 2013 timeframe by Dr. Anderson or a specialist.  *See Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994) (citing 20 C.F.R. § 416.927(d)(5)) ("We generally give greater weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

For these reasons, the Court finds that the ALJ gave good reasons for discounting the weight given to Dr. Anderson's opinions as they are inconsistent with the medical evidence.

## C.     The ALJ Did Not Display Bias

Plaintiff lastly argues that the ALJ displayed bias as shown by the following:

1) The ALJ seemed to believe that there was some doctoring of the audio transcript even though there was not. (Tr 44).

2) The ALJ called for a supplemental hearing to get the testimony of treating source doctor even though he had three prior opinions from that same doctor (Tr. 994-999)

3) The ALJ did not allow the treating source doctor to testify by telephone even though the rules specially say such an allowance should be made. (Tr 346 and relevant rule for testimony of treating source doctors).

4) The fact that ALJ questioned the doctor for a period of three (3) hours and then still assigned his opinion little weight.

5) The fact ALJ consistently interrupted Attorney Reitan during the hearings and displayed a consistent argumentative tone when interrupting.

(Dkt. 13 at 17-18.)

Even assuming each of these factors is true, none of them rise to the level of bias.

"ALJs and other similar quasi-judicial administrative officers are presumed to be

38

unbiased." *Perkins v. Astrue*, 648 F.3d 892, 902 (8th Cir. 2011) (quoting *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001)). "A claimant bears the burden of producing sufficient evidence to overcome this presumption." *Id.*

First, there is nothing unreasonable about the ALJ asking for the actual recording of Plaintiff's counsel's interview of Dr. Anderson rather than relying on the transcription. As the ALJ explained, he wanted to be "thorough" and there was "plenty of time" for counsel to provide the record. (R. 88.) The ALJ also said "if it's not available just let me know." (R. 88.) At the second hearing, the ALJ told Plaintiff's counsel: "I wanted to thank you for sending in the CD. I listened to it and in fact you know, you're right that it adequately -- it certainly adequately summarizes what the -- pretty much verbatim the conversation that you had." (R. 95.)

Second, the ALJ gave numerous reasons for securing the testimony of Dr. Anderson at the second hearing, including that "it's rare that we see somebody who has one treating physician the whole time that really knows a person" and that the ALJ was troubled by Dr. Anderson's written statement because "the statement has now created an inconsistency with what's in the records and I just want to have an opportunity to talk to him about those inconsistencies." (R. 47-48.) The ALJ explained that he viewed Dr. Anderson as a "pivotal witness" because his testimony, if credited, would "change the outcome of the case." (R. 57.)

Third, although the ALJ is permitted to allow the doctor to testify by telephone, an ALJ is not required to, *see* Hearings, Appeals, and Litigation Law ("HALLEX") Manual § I-2-5-78(C) ("Medical experts, vocational experts, and consultative examiners who will

not appear voluntarily (i.e., as requested by an ALJ without a subpoena) may be subpoenaed to appear under the same standard applicable to other witnesses."), and there is no indication of bias in wanting to interview the doctor at the hearing. Moreover, the ALJ explained why he wanted in-person testimony: "You know, the reason we bring people into a hearing room and we take testimony live is because that gives you the best possible venue. One, to explore all the options and two, to take a measure of one another." (R. 57.) Counsel responded: "My preference on the whole thing when I started this was live testimony would be better than anything else . . . ." (R. 58.) The Court finds no bias in the ALJ's decision to require Dr. Anderson to testify in person.

Fourth, the ALJ is not required to assign more weight to a physician simply because he testified or testified for a lengthy period. When assigning less then controlling weight to a treating source, the ALJ must "give good reasons" for doing so, such as where the opinion is inconsistent with the medical evidence. *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017) (citations omitted). As discussed above, the Court concludes that the ALJ gave good reasons for assigning little weight to Dr. Anderson's opinion.

Fifth, even if the ALJ interrupted Plaintiff's attorney during the hearings and displayed an argumentative tone, "it is well established that expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women sometimes display do not establish bias." *Perkins*, 648 F.3d at 903 (cleaned up). Plaintiff has the burden to show that "the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'"

*Id.* (quoting *Rollins*, 261 F.3d at 858). Plaintiff has made no such showing. For these reasons, the Court finds that Plaintiff has not met her burden in showing that the ALJ demonstrated bias against her.

## V.  ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.  Plaintiff Terry D.'s Motion for Summary Judgment (Dkt. 12) is **DENIED**;

2.  Defendant Commissioner of Social Security Andrew Saul's Motion for Summary Judgment (Dkt. 14) is **GRANTED**; and

3.  This case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED: September 13, 2019          *s/ Elizabeth Cowan Wright*
                                   ELIZABETH COWAN WRIGHT
                                   United States Magistrate Judge